[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action in three counts brought by Vespa Construction Co., Inc. (Vespa) against Sandy Lane Developing, Inc. (Sandy Lane) and Jewett City Savings Bank (Jewett Bank). Since judgment has already entered as to Sandy Lane, a non-appearing defendant, this court deals only with the allegations of counts two and three against Vespa. Count two alleges unjust enrichment; count three alleges breach of an implied escrow agreement.
Vespa's claims arise out of a payment arrangement devised to fund the construction of Thomassian Road (the Road) in the Thomassian subdivision in Marlborough, Connecticut (the Project). The facts are as follows:
In July of 1995 Vespa entered into a contract with Sandy Lane for construction of a road on property known as the Thomassian subdivision in the Town of Marlborough (the Town). Under the contract Vespa was to construct Chapman Road for an agreed upon price of $225,028.50, subject to authorized additions or reductions.
Before work on the road could begin a bond was required in the amount of $265,300.00 representing the Town of Marlborough's estimate of the cost to complete the Road plus a contingency amount which would be retained until the road had been accepted.
The Thomassian subdivision was financed by a $455,000.00 loan taken out by Sandy Lane from Jewett Bank. A portion of that loan was used to acquire the property on which Jewett Bank took a first mortgage. $265,300.00 of that loan was used by Sandy Lane CT Page 4096 to post as collateral for the bond required by the Town for the Road. Sandy Lane did not have the financial means to post the bond and to also pay for the Road construction. The Town agreed to allow the $265,300.00 to be deposited in a bank account which could be drawn down as stages of work were completed.
The $265,000.00 was placed in a passbook account in the name of Sandy Lane on deposit at Jewett Bank. On May 25, 1995 Sandy Lane executed a bond in the amount of $265,300.00 in favor of the Town. By a conditional assignment dated May 10, 1995 Sandy Lane conditionally assigned the account to the Town as security for the bond. Sandy Lane also at that time delivered possession of the passbook to the Town.
Under the payment arrangement, the Town agreed to allow reductions in the bond and corresponding releases of its conditional assignment as work was done by Vespa and inspected and approved by the Town. In their July 5, 1995 contract Vespa and Sandy Lane agreed that the funds from the account should be withdrawn with checks made payable jointly to Sandy Lane and Vespa.
When the first stage of construction, cleaning and boxing of the road had been completed and approved by the Town, Marion Staye, Marlborough's Planning and Development Director contacted Joseph Simmons, Vice President of Jewett Bank, to work out the logistics of getting funds out of the account to Vespa and Sandy Lane. Staye and Simmons agreed on a procedure under which the Town would request that a check be released payable to Vespa and Sandy Lane jointly after the Town had approved the work. Jewett Bank required Sandy Lane to sign a withdrawal slip requesting the check. Using this procedure the Town requested payments on November 8, 1995, December 22, 1995 and January 19, 1996. In each instance the Town requested that the amount specified be withdrawn from the account and that a check in that amount be made payable to Sandy Lane and Vespa. Two such checks were issued, one on November 9, 1995 in the amount of $31,506.20 and a second on January 3, 1996 in the amount of $89,923.42.
Stanley Golab, President of Sandy Lane, was the person with whom Vincent Vespa, Vice-President of Vespa negotiated the road construction contract. After Vespa began construction of the road, large boulders were found on the site. Because of their size the Town required they be removed. Vincent Vespa discussed the removal of these boulders with Stanley Golab as well as the problem of insufficient topsoil resulting from the presence of CT Page 4097 these large rocks. Vespa explained to Golab that Vespa could screen the topsoil on site, removing the rock and other material and making it suitable to spread the usual four inch layer of topsoil. Though screening the topsoil would be an extra cost, it was a less costly alternative for providing some of the extra topsoil needed than having to buy all the extra needed off site. In both instances Vespa told Golab that the boulder removal and screening of the topsoil would be extra. Golab agreed to pay the extra cost. A similar discussion took place regarding ledge removal. Here again Golab agreed to pay the extra cost for ledge removal.
Recognizing that the funds on deposit in the account might not cover all of these extras Golab told Vespa he could also use the proceeds of a lot sale. Vespa proceeded on the basis of this understanding to do the extras.
Vespa continued construction of the road until late November when two things happened. First, the Town insisted on certain changes to the road, in particular, the cul-de-sac, because of drainage problems unrelated to Vespa's work. Before Vespa could proceed any further with the road, revised engineering drawings had to be provided and approved by the Town. The other event in December, 1995, was the closing of Golab's construction business. These events coupled with Jewett Bank's refusal to advance any additional funds, caused Vespa to stop construction on the project. In January 1996, Emilia Vespa contacted Simmons who referred her to Jewett Bank's attorney who advised that Jewett Bank was not going to allow any additional money to be withdrawn from the account.
When Vespa stopped work it had already performed extra work, including breaking up, stockpiling and removing boulders. It had graded slopes, which work was part of the contract. It removed ledge and had screened and stockpiled 5,100 yards of topsoil. For this work the total amount owed was $59,991.34. Allowing for a credit of $3,472.80 issued to Vespa for return of the catch basin tops, a balance of $56,518.54 has been owed since January 1996. As of December 1995 Jewett Bank had called defaults j and accelerated principal balances due on all of Golab's loans. By the time Jewett Bank issued the second check to Vespa, on January 3, 1996, Jewett Bank had called the default of the May 10, 1995 loan and accelerated the entire balance due.
When Jewett Bank loaned Sandy Lane the funds to place in the bank account for the road construction, Jewett Bank obtained a CT Page 4098 secret conditional assignment of Sandy Lane's right to the funds in that account. This was not known by either the Town or Vespa. On February 2, 1996, Jewett Bank notified the Town of the existence of the Bank's assignment of the account and that it was giving the Town notice that that assignment was now absolute. No request was made by Jewett Bank of the Town to return the passbook.
In January 1996 Jewett Bank began a strict foreclosure action in connection with the project. The remaining 8 lots were appraised at $30,000 each for a total of $240,000.00. On October 25, 1996 Jewett Bank was granted a deficiency judgment in the amount of $151,493.46.
After gaining title to the foreclosed lots Jewett Bank advised the Town that it would undertake to complete the road construction. The Town suggested Vespa to finish the work. Jewett Bank hired someone else, Staddle Brook Development, Inc. None of the work done by Vespa had to be redone.
At all times Vespa stood ready to complete the road construction as agreed upon with Sandy Lane. Vespa was unable to do so because the money which had been placed on deposit in the bank account was no longer available, Jewett Bank having put the Town on notice that the bank had an absolute assignment of the funds remaining in the bank account.
Vespa's claim against Jewett Bank in its third count is breach of an implied escrow agreement. Jewett Bank has dealt with this count as one where Vespa is attempting to persuade the court that an implied agreement existed creating an obligation on the part of Jewett Bank to pay all work completed by Vespa from the passbook account which was subject to the bank's security interest. Jewett Bank contends further that this implied contract establishes the bank as a surety to guarantee the payment of the developer, Sandy Lane's debt and as such must be in writing as it comes within the statute of frauds.
Jewett Bank mischaracterizes Vespa's third count claim. In fact, the bank account was a repository for the Town's cash in lieu of a bond. The cash in this bank account was also the source from which the road contractor, Vespa, was to be paid. By agreement with Sandy Lane, Vespa, and the Town, this would be the dual purpose of the bank account. Jewett Bank was on notice of the plan and simply released money as withdrawals were made pursuant to this arrangement. As a condition of using the savings CT Page 4099 account in place of a bond the Town held the bank account passbook. As far as the Town and Vespa were concerned Jewett Bank had a ministerial function only. Sandy Lane was a depositor who had conditionally assigned to the Town his interest in the $265,300 on deposit in his account with Jewett Bank.
The fact that the $265,500 came out of the $455,000 loan made by Jewett Bank to Sandy Lane for the Thomassian subdivision does not give Jewett Bank any claim on the bank account. The undisclosed assignment of that account to Jewett Bank by Sandy Lane entered into after Sandy Lane had already conditionally assigned that account to the Town can only be denominated a precautionary measure Jewett Bank took to secure those monies from the reach of anyone but the Town. It was only when the road was built that Jewett Bank asked for return of the passbook even though unbeknown to the Town, Jewett Bank had transferred the balance of the money in the account to itself in April of 1996.
Jewett Bank's handling of the funds in the bank account resulted in Vespa not being paid for its work on the road, which work had been found acceptable by the Town but only paid for in part because of Jewett Bank's claim on the balance of the funds in the account. Jewett Bank was aware of Vespa's claim for work done and not paid for. In spite of this Jewett Bank undertook to complete the road using the remaining funds from the bank account toward new work done by the contractor Jewett Bank had hired after acquiring title to the eight lots remaining in the Thomassian subdivision.
While ordinarily a bank can setoff against accounts of its borrowers, where the bank knows that the account is set up for a specific purpose setoff is not allowed. "Funds deposited in a bank for a special purpose known to the bank or under special agreement cannot be setoff by the bank against a debt due it from the depositor. (Citation omitted)." Rose v. Colonial Bank,207 Conn. 483, 494 (1988). "Common examples of special purpose accounts include. . . . escrow accounts in which the bank has notice of third parties' interests in the account (citation omitted)." Id 495.
This court finds that Jewett Bank knew the bank account was a special account with the dual purpose of providing security to the Town and a source of payment to Vespa and that the account had been conditionally assigned to the Town by Sandy Lane and had had the account passbook delivered by Sandy Lane to the Town. The bank under these circumstances had a responsibility to determine CT Page 4100 what claims remained against the remaining funds in the bank account and to determine that those claims had been addressed before putting those funds to its own use.
Count two claims unjust enrichment. Jewett Bank's response to this is that it is a secured creditor and as such cannot have an unjust enrichment claim levied against it. Under the provisions of C.G.S. Sec. 36a-291 in order for Jewett Bank to have a perfected interest in the bank account and thus be a secured creditor Sandy Lane had to deliver the passbook to Jewett Bank and an order to Jewett Bank to transfer the pledged account to itself. Sec. 36a-291 provides in pertinent part as follows:
 . . . the interest of any named owner in any savings account established or maintained at any Connecticut bank. . . . may be pledged by such named owner. . . by delivery to the pledger of (1) the passbook, if any, evidencing such account and (2) an order to the Connecticut bank to transfer such pledged account to the pledgee. . .
Jewett Bank's claim that it stands as a secured creditor fails in light of the fact that Sandy Lane had already given the Town a conditional assignment of that same bank account before giving an assignment of that account to Jewett Bank. Jewett Bank was on notice of the conditional assignment to the Town when it took its own assignment.
Jewett Bank's claim that unjust enrichment will not lie against it because Jewett Bank is a secured creditor fails in light of the facts found by this court. Jewett Bank took its assignment after it had noticed that the bank account had already been conditionally assigned to the Town. Jewett Bank's conditional assignment gave it no rights whatsoever in that account until the special purpose for which it had been created was satisfied. Jewett Bank acted at its own peril when it chose to ignore that special purpose.
Jewett Bank also contends that the theory of unjust enrichment is an equitable remedy available to a plaintiff only in situations where no express contracts have been entered into by the parties. In the instant case count one which claims an express contract does so as to Sandy Lane only, not Jewett Bank.
". . . In order to recover on the basis of unjust enrichment, it is necessary for a plaintiff to demonstrate two aspects of the CT Page 4101 transaction. First, it must be shown that the defendant has benefitted [benefited], that is, that he has received something of value, and, second, it must be shown that the benefit was unjust, that it was not paid for by the defendant, to the detriment of the plaintiff." Providence Electronic Co. v. Sutton Place. Inc.,161 Conn. 242, 246 (1971). In this case Vespa has demonstrated that Jewett Bank derived a benefit. None of the work done by Vespa had to be redone by Jewett Bank's contractor Staddle Brook Development, Inc. The portion of the work done by Vespa which remained unpaid for was the benefit realized by Jewett Bank.
Judgment may enter for the plaintiff Vespa Construction Co. Inc. against Jewett City Savings Bank as to counts two and three. Damages in the amount of $56,518.54 plus interest in the amount of $12,725.64 are awarded as to each count; but, since the claimed damages are the same for each count, the plaintiff shall receive a single award of $56,578.54 plus interest in the amount of $12,725.64.
Hennessey, JTR.